## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOYCE MILLER,             )
                                )
             Plaintiff,     )      Case No. 11-CV-4089
                                )
    v.                     )      Magistrate Judge Susan E. Cox
                                )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,           )
                                )
             Defendant.   )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Joyce Miller, seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for Supplemental Security Income Benefits ("SSI") under Title XVI of the Social Security Act ("the Act"). The parties have filed cross-motions for summary judgment. Ms. Miller seeks a judgment reversing the Commissioner's final decision or remanding the matter for additional proceedings [dkt. 17], while the Commissioner seeks a judgment affirming his decision [dkt. 22]. For the reasons set forth below, Ms. Miller's motion is granted and the matter is remanded to the SSA for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

Joyce Miller applied for SSI on July 25, 2006, alleging that she had been unable to work since July 7, 2006,[2] because of pain from having lost her right eye, and depression from having

---

[1]On August 19, 2011, by the consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1(b), this case was assigned to this Court for all proceedings, including entry of final judgment [dkts. 8, 9].
[2]R. at 103.

experienced deaths in her family.[3] Her claim was denied on January 4, 2007.[4] Ms. Miller then filed

a request for reconsideration on March 2, 2007,[5] which was denied on January 17, 2008.[6] On

February 26, 2008, Ms. Miller requested a hearing before an Administrative Law Judge ("ALJ"),

which was granted on February 20, 2009.[7] A hearing took place before ALJ John L. Mondi on April

8, 2009.[8] Following the hearing, the ALJ issued an unfavorable decision, concluding that Ms. Miller

was not disabled within the meaning of the Act at any time after her application was filed.[9] The

Appeals Council denied Ms. Miller's request to review the ALJ decision on April 20, 2011, meaning

the ALJ's decision is the final decision of the Commissioner.[10] Ms. Miller filed this action on June

16, 2011.

## II.     FACTUAL BACKGROUND

The facts set forth under this section are derived from the administrative record. The section

begins with a summary of Ms. Miller's background, which is followed by overviews of Ms. Miller's

medical records, the documentation associated with her SSI application, her administrative hearing

testimony, and the ALJ's decision in the case.

### A.     Ms. Miller's Background & Introduction to her Medical History

Joyce Miller was born in Chicago, Illinois on March 3, 1965.[11] She and her four siblings all

had different fathers - she did not know hers.[12] She started taking care of her alcoholic mother at age

---

[3]R. at 124.
[4]R. at 64.
[5]R. at 71.
[6]R. at 63.
[7]R. at 89.
[8]R. at 26.
[9]R. at 15.
[10]R. at 1.
[11]R. at 380, 120.
[12]R. at 120, 338.

twelve and has childhood memories of one of her sisters' fathers beating her mother.[13] Ms. Miller used marijuana from age twelve to age sixteen and was sexually assaulted by her high-school boyfriend.[14] She dropped out of school in 1983 after completing the eleventh grade.[15] She has claimed that she dropped out for two different reasons: either after running from the police following being caught with a group of classmates who were smoking marijuana[16] or because she was raped.[17] At age seventeen, Ms. Miller became pregnant and married a man who was not her boyfriend.[18] Between 1985 and 2005, she worked in several jobs as a cashier, cook, mail sorter, and machine operator.[19] In 1987, Ms. Miller's brother was killed.[20] In 1994, she started using cocaine "on and off" and drinking regularly around the same time.[21] Over the years, Ms. Miller has been arrested multiple times both for drug possession and fighting.[22] At the height of Ms. Miller's alcohol and drug addictions, she drank four twenty-two ounce bottles of malt liquor plus a "half"[23] of hard liquor daily and smoked between one and four "dime bags" of crack cocaine per week.[24] She has tried heroin four or five times and "happy sticks" once, but reported not liking either of these drugs.[25]

---

[13]R. at 422.

[14]R. at 428.

[15]R. at 129.

[16]R. at 423 (as reported to her psychiatrist at Sinai Mile Square Community Health Center).

[17]R. at 338 (as reported to the SSA's Consulting Psychiatrist).

[18]*Id.* (Ms. Miller also reported getting pregnant at age 15 (R. at 396), but this is not consistent with the rest of the record).

[19]As reported on Ms. Miller's Disability Report (R. at 131) and HHS Directory of New Hires (R. at 116-19), contradicting the ALJ's reporting that she last worked in 1994-95 (R. at 17).

[20]R. at 422.

[21]R. at 408. In 2008, Ms. Miller reported that she had been using drugs and alcohol "for over 20 years." (R. at 445).

[22]R. at 444, 338.

[23]The record is not clear as to what unit this refers to - a half pint or half gallon.

[24]R. at 423. Elsewhere in the record it states that Ms. Miller has been using cocaine on and off since 1994 and that she had been using drugs and alcohol for over twenty years (R. at 445). She claimed to the same medical provider that she only started drinking and using cocaine at age thirty five (R. at 423). In 2008, she it is also documented that she had a seven year history of alcohol use (R. at 408). The record as a whole tends to support that she had been using drugs for the longer period of time.

[25]R. at 423. Happy sticks refer to phencyclidine. Nat'l Drug Intelligence Ctr., *PCP Fast Facts: Questions and Answers* (2003), *available at* http://www.justice.gov/ndic/pubs4/4440/index.htm.

In 2002, one of Ms. Miller's two sons was shot to death at age nineteen.[26] In 2004, her husband died from overdosing on heroin laced with rat poison.[27] Both of per parents-in-law died in the same year.[28] Ms. Miller stopped working in 2005 in order to help her ill mother get to and from the doctor.[29] In 2006, her mother died of heart problems.[30] On July 7, 2006, Ms. Miller lost her right eye after being stabbed with a small kitchen knife by a female "friend,"[31] either while she was intoxicated and engaged in gang violence,[32] during a drug altercation[33] or while she was walking down the street with the woman's boyfriend.[34] These events are not necessarily mutually exclusive. Ms. Miller filed for SSI eighteen days later, at age forty-one.

The following discussion of Ms. Miller's medical history is limited to the portions of her file that are relevant to her current SSI application. Therefore, we do not discuss her gynecologic issues, which resolved at age eighteen,[35] treatment she received for a dog bite, which healed successfully,[36] or any other extraneous complaints made. This leaves discussion of her eye and vision related issues and her mental health problems, as well as the documentation related to her SSI application. Since Ms. Miller has complained of disabling hypertension at various points in her application, we mention what her blood pressure was during various hospitalizations. However, since Ms. Miller did not raise the issue of hypertension in her current motion or reply, we do not address it further.

Also, the administrative record does not include medical records prior to Ms. Miller's eye

---

[26]R. at 422.
[27]R. at 389.
[28]R. at 378.
[29]R. at 124.
[30]R. at 422, 338.
[31]R. at 426, 206 (quotations in original).
[32]R. at 444 (as reported to her psychiatrist at Sinai Mile Square Community Health Center).
[33]R. at 422 (as reported to a social worker at Sinai Mile Square Community Health Center).
[34]R. at 338 (as reported to the SSA's Consultant Psychiatrist).
[35]R. at 409.
[36]R. at 283.

injury. However, it does reference that she has reported attending therapy sessions at Hartgrove Hospital in Chicago, Illinois ("Hartgrove"),[37] starting in 2004, following the death of her son.[38] She has also reported attempting suicide in 2005 by Tylenol overdose, but was not hospitalized and the attempt was never documented by a medical professional.[39] The following sections, reviewing Ms. Miller's eye treatment, application for SSI benefits, mental health treatments, and hearing are presented chronologically. Although there is some brief overlap between some of the sections, this is not material to the disposition of the case.

### B.    Ms. Miller's Eye Surgery & Related Followup

After Ms. Miller was stabbed in the right eye on July 7, 2006, she tried to treat her injury at home with ice packs and Motrin.[40]  The next day, she presented to West Suburban Medical Center ("West Sub") in Oak Park, Illinois.[41] She complained of severe, sharp, throbbing pain and a complete loss of vision in her injured eye.[42] Her blood pressure at West Sub was measured as 132/82.[43]  Ms. Miller was seen by an ophthalmologist there before being transferred to University of Illinois Medical Center at Chicago ("UIC"), in Chicago, Illinois, later that night.[44] At 2:00 a.m. on July 9, 2006, doctors at UIC determined that Ms. Miller had no light perception in her right eye and operated on her ruptured right eyeball.[45] During surgery, they determined that Ms. Miller's

---

[37]R. at 408
[38]R. at 443.
[39]*Id.*
[40]R. at 206. Motrin is a "trademark for preparations of ibuprofen." *Dorland's Illustrated Medical Dictionary* 1182 (32d ed. 2012).
[41]R. at 192.
[42]*Id.*
[43]R. at 195.
[44]R. at 211.
[45]R. at 280, 206, 215.

injured eye was not structurally repairable and recommended an enucleation of the right eyeball.[46] She was discharged on July 10, 2006, with instructions to follow up with UIC's eye clinic.[47] Ms. Miller returned to UIC for the enucleation surgery on July 18, 2006.[48] A temporary eyeball was implanted and her eye was stitched closed to help the eye heal.[49] On July 19, the eye sight in Ms. Miller's left eye was 20/20.[50]

Ms. Miller's post-surgery pain in her right eye subsided by September 1, 2006.[51] Despite trouble with keeping the eye stitched closed, her ophthalmologist reported that her right eye was "doing well."[52] On September 5, 2006, the eye sight in Ms. Miller's left eye was still 20/20.[53] During the same time frame, there is no documentation of pain, discomfort, or vision trouble in her record.

### C.      Ms. Miller's Application for Disability & SSA Referred Evaluations

Ms. Miller reported, on July 25, 2006, that she was unable to work due to depression and pain in her eye, without specifying which eye she was referring to.[54] She also claimed that she could not see well in her left eye because of blurriness.[55] Regarding her depression, Ms. Miller stated only that it was due to "ha[ving] a lot of deaths in [her] family recently," without elaborating on how it stopped her from working. She also complained of distractibility, trouble concentrating, forgetfulness, hallucinations, fear, and paranoia.[56]

---

[46]R. at 216, 206. Enucleation is the "removal of the eyeball after the eye muscles and optic nerve have been severed." *Dorland's Illustrated Medical Dictionary* 628 (32d ed. 2012).
[47]R. at 206, 207.
[48]R. at 204.
[49]R. at 205.
[50]R. at 271.
[51]R. at 261.
[52]R. at 268, 264-65, 279.
[53]R. at 278.
[54]R. at 124.
[55]R. at 140.
[56]R. at 140, 144, 141.

On September 21, 2006, Sharon Kobak, D.O., a state agency psychiatrist, assessed Ms. Miller's mental health.[57] Dr. Kobak diagnosed Ms. Miller with a depressive disorder, dementia, and a history of substance abuse.[58] These findings were incorporated into a report by another state agency

psychiatrist, Elizabeth Kuester, M.D., who on November 25, 2006 noted that Ms. Miller's record contained no history of hospitalizations for her mental health issues.[59] Dr. Kuester also found that Ms. Miller had a number of moderate limitations: her ability to understand and remember detailed instruction; her ability to carry out detailed instruction; her ability to maintain attention and concentration for extended periods; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; her ability to interact appropriately with the general public; her ability to accept instructions and respond appropriately to criticism from supervisors; her ability to get along with coworkers or peers without distract them or exhibiting behavioral extremes; and her ability to be aware of normal hazards and take appropriate precautions.[60] Dr. Kuester also noted that Ms. Miller could learn and perform simple tasks adequately with ordinary supervision but should not deal with hazards or the public.[61] Towfig Arjmand, M.D., a state agency physician who approved the medical portion of the first negative determination, including Dr. Kuester's report, made no additional findings regarding Ms. Miller's mental health, concluded that her left eye vision was within normal limits, and predicted that a year after Ms. Miller's eye injury, the physical

---

[57]R. at 337-40.
[58]*Id.*
[59]R. at 353.
[60]R. at 355-56.
[61]R. at 357.

condition of both of her eyes would be "durationally nonsevere."[62]

After determining that Ms. Miller was not disabled, the SSA reconsidered its decision, during which Ms. Miller was referred for two eye examinations.[63] On November 26, 2007, the results of the first test showed that her left-eye vision was "worse than 20/200."[64] On January 4, 2008, the results of the second test showed that Ms. Miller's left-eye vision, without correction, was 20/800.[65] The ophthalmologist who performed the second test also documented that he expected that, with correction, the left-eye visual acuity would be normal, and that otherwise, the eye examination was within normal limits.[66] Marion Panepinto, M.D., the state agency physician who signed off on the negative determination after reconsideration, additionally noted that Ms. Miller did not allege any new mental issues in her reconsideration documentation.[67] Ms. Miller was hospitalized for psychiatric issues approximately three weeks before Dr. Panepinto's report, but any documentation relating to the hospitalization was not included in her reconsideration application.

### D. Psychiatric Inpatient Hospitalization

On the night of December 23, 2007, Ms. Miller, while intoxicated, walked into West Sub, laid down on the floor, and told staff she wanted to kill herself.[68] She was then admitted to the inpatient psychiatric unit at John Madden Mental Health Center ("Madden") in Hines, Illinois, complaining that she "was suicidal, got no reasons to live for."[69] She reported that she got particularly depressed over the holidays, the time of year her husband and son both died.[70]

---

[62]R. at 361.
[63]R. at 364-66, 367-72.
[64]R. at 366.
[65]R. at 367.
[66]*Id.*
[67]*Id.*
[68]R. at 422.
[69]R. at 380.
[70]R. at 385.

Psychiatrists diagnosed Ms. Miller with (non-psychotic[71]) Major Depressive Disorder ("MDD"), alcohol dependence, and cocaine dependence and assessed her to be a medium risk in terms of both violence and suicide potential.[72] The next morning, a psychiatrist noted her suicide wish to be "passive" and prescribed her a daily, fifty-milligram dose of Zoloft.[73] Ms. Miller denied suicidal ideation and acknowledged that she was drunk when she had said she was suicidal.[74] On December 28, 2009, Ms. Miller reported that she was "not depressed anymore."[75] At discharge, her psychiatrist indicated that she responded well to medication.[76] Incidentally, during this hospitalization, Ms. Miller also complained of blurry vision in her left eye.[77]

### E.    Further SSA determination

After Ms. Miller was discharged from Madden, she obtained counsel and requested an ALJ hearing, following the previous negative disability determinations.[78] At the time of the request, she reported that she had been feeling "more depressed," and added high blood pressure and anemia to her list of complaints.[79]

### F.    Psychiatric Outpatient Followup & Stroger Visits

Following Ms. Miller's inpatient psychiatric hospitalization, she followed up for mental health treatment at the outpatient clinic at Sinai Mile Square Community Mental Health Center

---

[71]R. at 378.

[72]R. at 383-84.

[73]R. at 395, 378. Zoloft is a "trademark for preparations of sertraline hydrochloride," which is "used to treat depressive, obsessive-compulsive, and panic disorders." *Dorland's Illustrated Medical Dictionary* 2092, 1699 (32d ed. 2012).

[74]R. at 396.

[75]R. at 397.

[76]R. at 378.

[77]R. at 394.

[78]R. at 80-81, 77.

[79]R. at 165.

("Mile Square") in Chicago, Illinois.[80] Her intake appointment was on January 8, 2008, eight days after being discharged from Madden.[81] No diagnosis was made at this visit.

On January 13, 2008, Ms. Miller went to John H. Stroger, Jr. Hospital of Cook County ("Stroger") for a medication refill.[82] She denied any suicidal or homicidal ideation, but reported feeling depressed, worthless, helpless, and distractible, and having a low interest in life and low energy.[83] The psychiatrist diagnosed her with depressive disorder, primary or secondary to alcohol abuse, and increased her Zoloft prescription.[84] During this visit, Ms. Miller's blood pressure was 142/73.[85]

After the Stroger visit, Ms. Miller continued returning to her Mile Square outpatient sessions. A social worker outlined Ms. Miller's treatment goals on January 20, 2008 and performed a Mental Health Assessment the following week.[86] Ms. Miller subsequently attended twelve outpatient sessions with a psychiatrist in the next fourteen months.[87] She missed three appointments.[88] On February 11, 2008, Ms. Miller reported that as a result of her increased Zoloft prescription, her mood, sleep, appetite, hopelessness, crying spells, motivation, and irritability all improved.[89] She denied having suicidal thoughts, hallucinations, or delusions.[90]

---

[80]R. at 419.
[81]*Id.*
[82]R. at 407.
[83]R. at 407-08.
[84]R. at 408.
[85]R. at 407.
[86]R. at 426-27, 422-25.
[87]On February 11, 2008 (R. at 439-44), April 11, 2008 (R. at 438), May 9, 2008 (R. at 437), July 14, 2008 (R. at 436), August 4, 2008 (R. at 435), September 8, 2008 (R. at 434), October 20, 2008 (R. at 433), November 17, 2008 (R. at 432), January 2, 2009 (R. at 431), January 30, 2009 (R. at 430), February 27, 2009 (R. at 429), and April 27, 2009 (R. at 428).
[88]Ms. Miller did not attend scheduled appointments on June 6, 2008, December 22, 2008, and March 27, 2009, but did not attend these (R. at 437, 432, 429).
[89]R. at 442.
[90]*Id.*

Although previously, Ms. Miller had a history of being non-compliant in terms of both keeping appointments and taking medications, the psychiatrist at Mile Square noted that she had been drug compliant since her Madden discharge.[91] He also noted that she reported not having consumed alcohol or cocaine in that time frame.[92] Over the course of her outpatient clinic visits at Mile Square, she was diagnosed with slightly different conditions at each of her visits. These varied from: recurrent MDD without psychotic features, post-traumatic stress disorder ("PTSD"), and substance dependence[93]; MDD, PTSD, and substance dependence[94]; MDD and PTSD[95]; MDD with psychosis, with possible bipolar disorder[96]; MDD with psychosis or bipolar disorder[97]; MDD with psychosis[98]; MDD with psychosis and substance dependence[99]; MDD with psychosis, substance dependence, and [illegible][100]; MDD with psychosis and substance dependence, inadequately controlled worsening due to non-compliance[101]; MDD with psychosis, but no psychosis at present, stable[102]; and MDD with psychosis.[103]

Ms. Miller visited Stroger for medication refills on July 25, 2009.[104] During this visit, she reported having been raped, which was causing her to have nightmares, flashbacks, and a tendency to become easily startled.[105] She also reported that she blacked out during the incident and could

---

[91]R. at 386, 443.
[92]*Id.*
[93]R. at 444 (on February 11, 2008).
[94]R. at 438 (on April 11, 2008).
[95]R. at 437 (on May 9, 2008).
[96]R. at 436 (on July 14, 2008)..
[97]R. at 435 (on August 4, 2008).
[98]R. at 434 (on September 8, 2008).
[99]R. at 433 (on October 20, 2008).
[100]R. at 432 (on November 17, 2008).
[101]R. at 431 (on January 2, 2009).
[102]R. at 430 (on January 30, 2009 and February 27, 2009).
[103]R. at 428 (on April 27, 2009).
[104]R. at 403.
[105]R. at 401.The rape was also documented in Ms. Miller's Mile Square records (R. at 437).

have been killed.[106] She said she felt detached and guilty about her son's death and had poor sleep

and appetite, difficulty focusing, and poor energy.[107] She was reported as having psychomotor

slowness and anhedonia.[108] She was diagnosed with MDD with a possibility of PTSD, consistent

with her Mile Square diagnoses, and given medication refills.[109] During this visit, her blood pressure

was recorded at 160/87.[110] The record indicates that Ms. Miller continued to drink and use drugs

until at least March 2009.[111]

### G.     ALJ Hearing

On April 8, 2009, ALJ John L. Mondi conducted a hearing regarding Ms. Miller's disability

claim.[112] Ms. Miller was represented by counsel.[113] The ALJ heard testimony from Ms. Miller, her

counsel, and Vocational Expert ("VE") Thomas Gusloff.[114]

### 1.     Ms. Miller's Testimony

Ms. Miller's counsel opened by stating that her case involved a mixture of psychological and

physical issues.[115] The psychological issues related to depression due to the loss of her loved ones,

being the victim of at least one sexual assault, and dementia.[116] The physical issues arose from her

artificial eye and consisted of pain, discomfort, and headaches.[117] Ms. Miller's counsel also stressed

that Ms. Miller's substance abuse follows from her depression, not vice versa.[118]

---

[106]R. at 401.
[107]*Id.*
[108]*Id.* Anhedonia is the "total loss of feeling of pleasure in acts that normally give pleasure." *Dorland's Illustrated Medical Dictionary* 91 (32d ed. 2012).
[109]R. at 401.
[110]R. at 403.
[111]R. at 212, 390, 408, 32.
[112]R. at 26-63.
[113]R. at 26.
[114]*Id.*
[115]R. at 27-28.
[116]R. at 28.
[117]*Id.*
[118]R. at 28.

When asked what health problems she had that would prevent her from working, Ms. Miller testified: "I have high blood pressure, sometime I pass out anywhere. And stomach problems and I have a problem with sleeping so I take a sleeping pill. I take Zoloft and Abilify."[119] When asked what psychological problems she had that would stop her from working full time, she testified: "[d]ealing with enemies and a lot of time that medication have me kind of tired."[120] She was unable to raise the issues listed in her SSI application without prompting by her counsel.

In relation to her mental health, Ms. Miller testified that in addition to the medical records on file, she saw a psychologist at Hartgrove for over a year.[121] At the time, she was seeing a psychiatrist at Mile Square.[122] She testified that she had only missed one appointment.[123] She complained that her depression leads to anxiety attacks, that she has trouble with concentration, distractibility, attention span, and anger.[124] She also mentioned that the side effects of her medication made her jittery, jumpy, nervous and paranoid.[125]

In terms of her substance abuse, Ms. Miller testified that she last used both alcohol and cocaine on her birthday, approximately one month before the hearing date.[126] She has been in substance abuse treatment twice and has two DUIs.[127] She reported that she drinks because sometimes she "don't like some of the [e]ffects of the medication."[128]

In relation to her eyes, Ms. Miller testified that every other day, it feels as if she has rocks

---

[119]R. at 33. Abilify is a "trademark for preparations of aripiprazole," which is an antipsychotic. *Dorland's Illustrated Medical Dictionary* 3, 132 (32d ed. 2012).
[120]R. at 51.
[121]R. at 50.
[122]R. at 39.
[123]R. at 49.
[124]R. at 39, 52-53.
[125]R. at 42, 35.
[126]R. at 33.
[127]R. at 38, 36.
[128]R. at 42.

where her right eyeball used to be and that every morning it "automatically shut[s] down so it keeps a lot of fluid inside."[129] Twice a week, she uses saline solution to cleanse the eye.[130] She was not clear what causes the feeling, how she is able to relieve it or how long it lasts. She stated that her left eye "sometimes . . . get[s] achy real bad," that her eyesight is always blurry, and that three to four times per week, her vision gets "real blurry . . . even dimmer."[131] When asked how long before it gets more normal, she replied "I never really thought about it," then when prompted, stated about an hour.[132] When asked if she gets headaches, she stated "around the mouth area," and then replied "yeah" when asked by her counsel if she meant "in front of the forehead above [her] eyes."[133] The headache lasts until she takes Tylenol.[134]

In terms of work related issues, Ms. Miller began by testifying that she has an eleventh grade education and has not worked or looked for work since the date of her alleged disability.[135] Her last job was for Avon as a full-time line attendant, which involved checking filled bottles for defects as they came out of a machine.[136] The job sometimes involved lifting over twenty or fifty pounds.[137] Her job as a fork lift driver in the past also involved lifting boxes and boulders.[138] Ms. Miller testified that she could lift a gallon of milk and "might have a little hesitation" with lifting twenty pounds.[139] She could walk half a mile, but would need to stop and sit, and she gets out of breath if

---

[129]R. at 44.
[130]*Id.*
[131]R. at 46-47.
[132]R. at 47.
[133]R. at 45.
[134]R. at 46.
[135]R. at 29-30.
[136]R. at 54.
[137]R. at 31.
[138]R. at 32.
[139]R. at 34.

she climbs stairs.[140] She also does not drive.[141]

In terms of personal care, Ms. Miller testified that she lives with her niece, who does most of the cleaning.[142] Her son does her laundry.[143] She does not go out to visit friends but walks to the stores a block away, sometimes using public transportation.[144] She spends most of the day staring at the TV.[145] Her son brings her food and sometimes friends come to visit her.[146]

## 2. VE's Testimony

Next, the VE testified, having stated that he had reviewed Ms. Miller's record.[147] The VE classified Ms. Miller's past work at Avon as a machine packager, which is of medium demand with a specific vocational preparation level ("SVP") of two, and is unskilled.[148] Her previous employment as a fork lift driver is classified as an industrial truck operator, which is of medium demand with an SVP of three, and is at the low end of semi-skilled.[149]

The ALJ then asked the VE whether a hypothetical person with Ms. Miller's age, eleventh grade education, having had their right eye enucleated, with the moderate limitations listed in Dr. Kuester's report, could return to either of her past positions or transfer any skills to an unskilled position.[150] The VE replied that such a hypothetical person could resume the line attendant position.[151] The ALJ then asked the VE to fully credit Ms. Miller's testimony and apply that to the

---

[140]*Id.*
[141]R. at 36.
[142]*Id.*
[143]R. at 37.
[144]R. at 36-37.
[145]R. at 37.
[146]R. at 37-38.
[147]R. at 55.
[148]R. at 56.
[149]*Id.*
[150]R. at 56.
[151]R. at 57.

hypothetical person and determine whether such a person could return to work.[152] The VE replied

that such a hypothetical person could not return to work, since she would need one hour to regain

her sight after her vision went blurry.[153]

Ms. Miller's counsel asked the VE whether there were similar jobs to the line attendant

position that were in the light exertion range rather than the medium exertion.[154] The VE replied that

there were similar packaging jobs in the light range.[155] He then testified that an employee in such

a light range position could not miss more than fifteen percent of a day for any reason or two days

per month.[156] In the line attendant position, a worker could slow down for a few minutes without

serious consequence.[157] However, a pattern of inability to accept instructions, respond appropriately

to criticism of supervisors, and back-talking would "probably be problematic."[158] He also stated that

such a position requires near and far acuity but can be accomplished with one eye.[159] After the VE's

testimony, the ALJ closed the hearing.

### H.      The ALJ's Decision

In an opinion issued on July 24, 2009, the ALJ concluded that Ms. Miller was not disabled

within the meaning of the Act at any time on or after July 25, 2006, the date the application was

filed.[160] He opined that Ms. Miller was unable to establish that she has a disability that would

prevent her from working the type of position that she held before the impairment or any other kind

of gainful work generally available in significant numbers within the national economy, for one year

---

[152]*Id.*
[153]*Id.*
[154]R. at 58.
[155]*Id.*
[156]R. at 59.
[157]R. at 60.
[158]R. at 61.
[159]R. at 62.
[160]R. at 15-23.

or more, as required by SSA regulations.[161]

SSA regulations prescribe a sequential five-part test for ALJs to use in determining whether a claimant is disabled.[162] The ALJs' first step is to consider whether the claimant is presently engaged in any substantial gainful activity, which would preclude a disability finding.[163] In the present case, the ALJ determined that Ms. Miller had not engaged in substantial gainful activity since July 25, 2006, her application date.[164] The second step is to consider whether the claimant has a severe impairment or combination of impairments.[165] In the present case, the ALJ concluded that Ms. Miller had the medically determinable severe impairments of status post-enucleation of her right eye, hypertension, and a mental impairment involving polysubstance abuse, depression, and PTSD.[166]

The ALJ's third step is to consider whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity.[167] In the present case, the ALJ determined that Ms. Miller's impairments did not meet or medically equal a listed impairment, even in combination, under 20 C.F.R. Part 404, Subpart P, Appendix 1.[168] He reviewed listings 2.02 (Loss of Visual Acuity), 2.03 (Contraction of the Visual Fields in the Better Eye), 2.04 (Loss of Visual Efficiency), 12.04 (Affective Disorders), and 12.09 (Substance Abuse Disorders).[169]

With respect to Ms. Miller's vision, the ALJ concluded that Ms. Miller's visual acuity did

---

[161]R. at 15, 42 U.S.C. § 423(d)(1)(A).
[162]20 C.F.R. § 404.1520(a)(4).
[163]*Id.* § 404.1520(a)(4)(I).
[164]R. at 18.
[165]20 C.F.R. § 404.1520(a)(4)(ii).
[166]R. at 18.
[167]20 C.F.R. § 404.1520(a)(4)(iii).
[168]R. at 19.
[169]R. at 19.

not satisfy listing 2.02, which requires that after best correction, the remaining vision in the better eye be 20/200 or worse.[170] The ALJ reasoned that Ms. Miller's eye tested as 20/20-2 on September 1, 2006.[171] He discredited Ms. Miller's January 4, 2008 eye test, which found her vision to be worse than 20/200, based on the examining ophthalmologist's note questioning the results of the test and stating that the test was not consistent with previous relevant evidence.[172] The ALJ concluded that Ms. Miller's vision did not meet or medically equal the criteria for listings 2.03 and 2.04, reasoning that no tests prescribed in the listings were performed.[173]

Similarly, the ALJ concluded that Ms. Miller's mental impairments did not meet the criteria of listing 12.04.[174] That listing prescribes that to be disabling, a mental impairment must cause either (1) market limitation in at least two of the following: activities of daily living; maintenance of social functioning; maintenance of concentration, persistence, or pace; or (2) marked limitation in one of the following: activities of daily living; maintenance of social functioning; maintenance of concentration, persistence, or pace; **and** repeated episodes of decompensation, each of extended duration.[175] The ALJ reasoned that Dr. Kuester had determined that Ms. Miller had mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.[176] As such, Ms. Miller did not meet the criteria listed above.[177]

The ALJ further concluded that Ms. Miller's mental impairments did not meet the

---

[170]*Id.*
[171]*Id.*
[172]*Id.*
[173]*Id.*
[174]*Id.*
[175]*Id.* (emphasis in original).
[176]R. at 20.
[177]*Id.*

"paragraph-C" criteria under listing 12.04, which would require a medically documented history of an affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and at least one additional factor.[178] The factors include: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase on mental demands or change in the environment would be predicted to cause the individual to decompensate; and (3) current history of one or more years's inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.[179] Ms. Miller did not meet these criteria.[180]

The ALJ also concluded that Ms. Miller's substance dependence did not meet the criteria of listing 12.09. That listing requires behavior changes or physical changes associated with the regular use of substances that affect the central nervous system and fulfill the criteria of an associated disorder.[181] The ALJ reasoned that since the criteria of 12.04 were not met, those of 12.09 were also not met.[182]

In the event that no impairments are found, the ALJ proceeds to the fourth step of the test, which is to determine whether the claimant is able to perform her past relevant work.[183] This involves evaluating the claimant's RFC based on the record and her testimony and comparing it to the requirements of her past work.[184] When determining the claimant's RFC, the ALJ is required to

---

[178]*Id.*
[179]*Id.*
[180]*Id.*
[181]R. at 19.
[182]*Id.*
[183]20 C.F.R. § 404.1520(a)(4)(iv).
[184]*Id.*

assess the claimant's subjective complaints and follow a two-step process.[185] First, he determines whether there is an underlying medically determinable impairment, determinable by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the claimant's symptoms.[186] If so, the ALJ then evaluates the intensity, persistence, and limiting effects of a claimant's symptoms on her ability to do basic work activities.[187] When making determinations about the credibility of the claimant's subjective complaints, the ALJ must consider the entire record.[188] The ALJ need only consider the subjective symptoms to the extent that they can reasonably be accepted as consistent with the objective medical evidence and other evidence.[189] If, after this process, the ALJ determines that the claimant's RFC makes her able to perform her past work, she is found not to be disabled.[190]

In the present case, the ALJ concluded that Ms. Miller has the RFC to work at all exertional levels, subject to mental limitations to simple work-related tasks with ordinary supervision and no more than minimal contact with the public.[191] He determined that there was no objective medical evidence other than Ms. Miller's loss of vision in her right eye to substantiate her subjective claims.[192] He rejected Ms. Miller's "testimony of pain, other symptoms, and functional limitations such as she described in lifting and walking . . . [as] not credible," based on her history of "severe substance abuse" as well as Dr. Kuester's findings that Ms. Miller's mental health symptoms were not disabling.[193] He adopted Dr. Kuester's report, as it was "consistent with the medical and other

---

[185]20 C.F.R. § 404.1529.
[186]*Id.* § 404.1529(b).
[187]20 C.F.R. § 404.1529(c).
[188]*Id.* § 404.1529(c)(4).
[189]*Id.*
[190]20 C.F.R. § 404.1520(a)(4)(iv).
[191]R. at 20.
[192]R. at 21.
[193]*Id.*

evidence, including the recent treatment records and the testimony to the extent it is being credited."[194] Again, he concluded that Ms. Miller's subjective complaints were "only partially credible."[195]

Based on his RFC finding, the ALJ concluded that Ms. Miller was capable of performing her past work as a line attendant, which was an unskilled job with a medium level of exertion.[196] This obviated the need to proceed to the fifth step of the test, which is to evaluate whether the claimant is able to perform any other work existing in significant numbers in the national economy.[197]

## III.    STANDARD OF REVIEW

The court must sustain the Commissioner's findings of fact if they are supported by substantial evidence and are free of legal error.[198] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[199] The standard of review is deferential, but the reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision.[200] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner and not the court.[201] Although the ALJ need not address every piece of evidence or testimony presented, he must adequately discuss the issues and build an accurate and logical bridge from the evidence to conclusion.[202] The court will conduct a critical review of the evidence and will not uphold the ALJ's

---

[194]R. at 22.
[195]*Id.*
[196]*Id.*
[197]20 C.F.R. § 404.1520(a)(4)(v).
[198]42 U.S.C. § 405(g).
[199]*McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).
[200]*Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).
[201]*Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987)).
[202]*Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir.2010), *McKinzey*, 641 F.3d at 889.

decision if it lacks evidentiary support or an adequate discussion of the issues.[203]

## IV. ANALYSIS

In her brief, Ms. Miller argues that the ALJ's decision must be reversed or remanded because the ALJ erred by failing (1) to make a proper credibility finding, including a failure to analyze Ms. Miller's testimony against the factors listed under SSR 96-7p; (2) to account for the fact that the severity of Ms. Miller's mental impairment significantly increased in the two and a half years between Dr. Kuester's report and the decision; (3) to include any visual limitation in Ms. Miller's functional capacity finding to accommodate her right-eye blindness; (4) to place appropriate work restriction in the functional capacity finding to accommodate Ms. Miller's moderate difficulties in concentration, persistence, and pace; and (5) to accommodate Ms. Miller's moderate difficulty in accepting instructions and criticism from supervisors in her functional capacity.[204] In examining these claims, we find that the ALJ failed to build a logical bridge between the available evidence and his findings in relation to his credibility determination and his finding regarding the listing assessment of Ms. Miller's mental health. Although this alone necessitates a remand, for the purposes of a complete review, we address all of the arguments in turn.

### A. The ALJ's credibility determination.

Ms. Miller first argues that the ALJ's determination of her credibility was flawed because he determined that she was "only partially credible," which is "boilerplate language."[205] Because the ALJ did not indicate what exactly he found credible, she argues the finding cannot stand.[206] The

---

[203]*Clifford v. Apfel*, 227 F.3d 863, 839 (7th Cir.2000).
[204]Pl. Mem. at 5-15, dkt. 16.
[205]Pl. Mem. at 5-6, dkt. 16.
[206]*Id.*

Commissioner responds that the ALJ discussed his credibility analysis "at length."[207]

An ALJ may find that a plaintiff's symptoms are "not entirely credible" if the finding is supported by substantial evidence.[208] The ALJ need not accept a plaintiff's subjective complaints if they conflict with objective evidence in the record.[209] However, he must thoroughly examine the evidence and clearly articulate his findings.[210] This is because in reviewing the ALJ's decision, we do not assess the whole record, rather, only the reasons given by the ALJ.[211] A negative determination of credibility must "contain specific reasons for the finding . . . supported by evidence . . . and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[212] The credibility finding must "build an accurate and logical bridge between the evidence and the result."[213]

We find that the ALJ did not build a sufficiently logical bridge in explaining his credibility determination. The credibility determination was critical because the VE testified that if Ms. Miller's testimony was fully credited, she would be unable to perform any work. The ALJ partially credits Ms. Miller's testimony, stating that her "allegations . . . are only partially credible" and that Dr. Kuester's report was "consistent with . . . the testimony to the extent it is being credited."[214] In explaining his finding, however, the ALJ does not make clear what testimony he is crediting. Although he states that Ms. Miller's "testimony of pain, other symptoms, and functional limitations

---

[207]Def. Mot. at 2-3, dkt. 22.
[208]*Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2007).
[209]*Arnold v. Barnhart*, 473 F.3d 816, 822-23 (7th Cir. 2007).
[210]*Castile*, 617 F.3d at 930.
[211]*Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).
[212]SSR 96-7p, 1996 WL 374186 (July 2, 1996).
[213]*Castile*, 617 F.3d at 929 (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).
[214]R. at 22.

such as she described in lifting and walking . . . are not credible" we are left guessing which "other symptoms" he is referring to.[215] He then appears to find her not credible because of her "severe substance abuse" and because Dr. Kuester's report found Ms. Miller's mental health impairments not to be disabling.[216] However, it does not address Ms. Miller's eye complaints. As such, his general discussion does not sufficiently explain what statements received what weight and for what specific reasons.

In addition to being required to build a logical bridge, the ALJ may not ignore an entire line of evidence that is contrary to the ruling.[217] While he states that he has compared Ms. Miller's subjective complaints "to the objective evidence and evaluated [them] using [the] factors in Social Security Ruling 96-7p," it is not clear that the ALJ has in fact done so after considering all of the evidence in the record.[218] In particular, he does not explain why on one hand, he cites Dr. Kuester's report to justify his credibility finding, but on the other hand, does not address the extensive mental health treatment that Ms. Miller obtained after Dr. Kuester issued her report. This is troubling because Dr. Kuester specifically noted the absence of psychiatric treatment in Ms. Miller's medical record as a reason for why her impairments were not disabling. Since then, however, Ms. Miller has been diagnosed with MDD on multiple occasions. To clarify, we are not addressing whether the ALJ's finding was factually correct or incorrect, only that he failed to explain his finding sufficiently. Because the ALJ failed to articulate which of Ms. Miller's statements he was crediting in finding her "only partially credible" and because he failed to address why her extensive mental health treatment did not render her subjective complaints regarding her depression credible, the case

---

[215]R. at 21.
[216]R. at 21-22.
[217]*Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).
[218]R. at 21.

must be remanded.

### B. Listing Assessment of Ms. Miller's Mental Condition

Ms. Miller next argues that the ALJ erred in adopting Dr. Kuester's opinion, because he did not (1) consider Ms. Miller's dementia in his opinion; (2) acknowledge her PTSD, which manifested after Dr. Kuester's report; and (3) use a medical expert to obtain an updated opinion on medical equivalence in light of new evidence.[219] The Commissioner responds that Ms. Miller did not offer evidence other than her own "conclusory statements" that her subsequent medical records do not show a deterioration of her condition, and that the ALJ was not required to obtain the opinion of a medical expert.[220]

As to the ALJ's treatment of Ms. Miller's alleged dementia, we find no error. The ALJ is not required to address every piece of evidence in the medical record.[221] Dr. Kuester incorporated Dr. Kobak's finding of dementia into her report. Therefore, by adopting the findings of Dr. Kuester's report, the ALJ also incorporated Dr. Kobak's finding. He was not required to specifically mention it.

As to the ALJ's failure to consider Ms. Miller's PTSD, the ALJ must consider a claimant's medical situation as a whole and, as stated above, the ALJ may not ignore an entire line of evidence that is contrary to his ruling.[222] Also, if, in preparing his or her opinion, a state agency psychiatrist has only reviewed a portion of the applicant's psychiatric medical records and there is a chance that the complete record would affect the state agency psychiatrist's assessment, then the ALJ must

---

[219]Pl. Mem. at 7-10, dkt. 16.
[220]Def. Mot. at 3-4, dkt. 22.
[221]*Jones*, 623 F.3d at 1160.
[222]*Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004), *Terry*, 580 F.3d at 477.

adequately explain why the state agency psychiatrist's opinion is controlling.[223] A failure to do so is a failure to build a rational bridge from the evidence to the finding.[224] In adopting Dr. Kuester's findings in relation to Ms. Miller's mental health functionality, but not addressing her subsequent mental health records, the ALJ ignored substantial medical history without explaining why he was doing so. This constitutes another failure to build a rational bridge and requires a more thorough explanation.

As to the ALJ's failure to obtain an updated medical opinion during her hearing, SSR 96-6p requires that the ALJ "must obtain an updated medical opinion from a medical expert . . . [w]hen additional medical evidence is received that *in the opinion of the [ALJ]* may change the State agency medical or psychological consultant's finding that the impairment[] is not equivalent in severity to any impairment in the Listing of Impairments."[225] Therefore, if on remand, it is not the ALJ's opinion that the additional psychiatric records would change Dr. Kuester's finding, he is not required to obtain the opinion of a medical expert. However, like above, he must provide a logical bridge between the evidence and his findings.

---

[223]*Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).
[224]*Barrett*, 355 F.3d at 1069.
[225]SSR 96-6p, 1996 WL 374180 (July 2, 1996) (emphasis added).

## C.    Remaining Arguments

As previously stated, Ms. Miller's remaining arguments are discussed for the purpose of a conducting a complete review. Several of Ms. Miller's remaining arguments cannot be fully addressed until the ALJ's credibility determinations are clarified - specifically, whether in his RFC determination, the ALJ properly accommodated Ms. Miller's (1) visual limitations by not considering the effect of her right-eye blindness on her left-eye depth perception and her other right-eye symptoms; (2) concentration limitations; and (3) limitations in her ability to work with supervisors.[226]

At present, we know that the ALJ based his RFC determination regarding Ms. Miller's mental capacity on Dr. Kuester's report. Aside from these mental limitations, we do not know what physical limitations Ms. Miller has, since we do not know what, if any, subjective symptoms the ALJ has credited. Once the ALJ clarifies which symptoms he has credited, it will be clear what accommodations, if any, need to be made, based on the issues raised in Ms. Miller's motion. If the ALJ does in fact not credit any of Ms. Miller's subjective complaints, the objective evidence may support that no RFC accommodations need to be made. Whatever findings the ALJ makes, he must build a logical bridge between them and the evidence in the record.

Similarly, the clearer credibility determination will go toward resolving the issue of the VE's testimony: that there would be no jobs available to Ms. Miller if all of her testimony was fully credited. If, after the credibility determination, the ALJ finds any of Ms. Miller's statements during the hearing not to be credible, the issue will be moot.

Finally, in regards to Ms. Miller's claim that the ALJ failed to accommodate her right eye

---

[226]Pl. Mem. at 10-15, dkt. 16.

blindness when asking his hypothetical questions to the VE, she cites to *Young v. Barnhart*.[227] In *Young*, the court stated that hypothetical questions "need not include [an applicant's] every physical limitation, provided that the [VE] had the opportunity to learn of the applicant's limitations through, for example, an independent review of the medical records or through other questioning at the hearing."[228] Additionally, there must be "some amount of evidence in the record indicating that the vocational expert knew the extent of the applicant's limitations."[229] We find that the hypothetical questions posed by the ALJ to the VE meet this standard. During Ms. Miller's hearing, the ALJ instructed the VE that Ms. Miller was "status post nucleation [sic] right eye."[230] Also, the VE testified that he had reviewed Ms. Miller's file, had been present throughout the hearing, and had heard all her testimony.[231] The VE was not instructed to exclude any of Ms. Miller's characteristics from consideration and therefore the question was not erroneous.

## IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion is denied [dkt. 22] and Ms. Miller's motion is granted [dkt. 17]. This case is remanded to the SSA to take action consistent with this opinion.

**IT IS SO ORDERED.**

Susan E. Cox
United States Magistrate Judge

Date: August 16, 2012

---

[227]Pl. Mem. at 11, dkt. 16 (citing *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004)).
[228]*Young*, 362 F.3d at 1003.
[229]*Id.*
[230]R. at 56.
[231]R. at 55.